UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

Nisim YUSHUVAYEV,

                Petitioner,

   -against-

UNITED STATES OF AMERICA,

                Defendant.

-------------------------------------------------x

<u>MEMORANDUM AND ORDER</u>
07 - CV - 1338

GLASSER, United States Senior District Judge:

      Petitioner Nisim Yushuvayev seeks an order pursuant to 28 U.S.C. § 2255

("Section 2255") vacating his conviction and sentence in the underlying criminal action,

<u>United States v. Kang</u>, 04-CR-87.  Mr. Yushuvayev alleges that he was ineffectively

assisted by his attorney, Barry Zone, in several ways, most prominently by Mr. Zone's

advising Mr. Yushuvayev to accept a plea agreement which included a stipulation that

Mr. Yushuvayev's crime involved kidnapping and conspiracy to kidnap, and by failing to

move to dismiss the indictment, which allegedly violated Mr. Yushuvayev's rights under

the Sixth Amendment to the federal Constitution to confront his accusers and to know

the nature of the charges against him.  For the reasons stated below, Mr. Yushuvayev's

Section 2255 petition is dismissed.

## BACKGROUND[1]

### 1.     Wun Hee and Kyongja Kang's Peonage Operation

The story of Mr. Yushuvayev's offense begins with Wun Hee Kang and Kyongja Kang, a married couple of South Korean origin who owned several nail salons on Long Island and a bar known as Renaissance in Queens, New York.  In April 2003, Kyongja Kang traveled to South Korea for the purpose of recruiting young women to work at Renaissance.  Mrs. Kang allegedly promised the women that they would be paid $40 per day, plus tips, and would not be required to have sexual relations with the customers while working at the bar.  Relying on these representations, two young women who are now cooperating witnesses, known to the Court only as Jane Doe 1 and Jane Doe 2, agreed to accompany Mrs. Kang back to New York, arriving on May 30, 2003.

Upon arriving in the United States, however, the cooperating witnesses quickly learned that Mrs. Kang's representations were untrue.  Mr. Kang met the cooperating witnesses when they arrived at John F. Kennedy International Airport and drove the young women to a house in Flushing, Queens, where they were thereafter required to live.  Mr. Kang also forced the women to surrender their passports and their return airline tickets.  The women began work at Renaissance the next day, working 6 ½ hour shifts for six days per week.  Rather than the $40 per day they were initially promised, the women were paid only $30 per day, plus tips; moreover, the women were informed that they each owed the Kangs approximately $20,000 for various travel-related

---

[1]     The following statement of facts is drawn primarily from Mr. Yushuvayev's Presentence Investigation Report ("PSR").  Mr. Yushuvayev did not object to any of the assertions of the underlying facts of the case as stated in the PSR.  Both cooperating witnesses submitted written statements which corroborate the statements of fact summarized herein.

expenses, and were forced to sign promissory notes in the amount of $20,000.  They were not permitted to keep their wages or tips while working at Renaissance; rather, all of their income was taken by the Kangs and credited toward their "debt."  In addition, the women were not permitted to leave the house in which they were staying without the Kangs' permission, and, because all of their income was confiscated by the Kangs, were forced to borrow money from the Kangs when they wished to make any purchases outside the bar, thereby increasing their indebtedness.

According to statements by Jane Does 1 and 2, sometime in mid-June 2003, an employee of Renaissance approached several "hostesses," including both of the cooperating witnesses, and told them that they could earn more money by having sexual relations with some of the customers.  The women refused to engage in prostitution, and a few weeks later, in July 2003, Wun Hee Kang informed Jane Does 1 and 2 that they were not paying off their debt quickly enough and that they could earn more money by having sex with customers, as other employees did.[2]  When the women again refused, Mr. Kang threatened to "crack their skulls," and thereafter was verbally abusive and threatening when the women refused to engage in prostitution.  The cooperating witnesses also alleged that Mr. Kang sexually assaulted them on several occasions in 2003,[3] though Mr. Kang denied this at his sentencing hearing and the government chose

---

[2]     The government's allegations indicate that a number of other women in situations similar to that of the cooperating witnesses also worked at Renaissance and at the Kangs' nail salons.  However, all of the criminal charges in the underlying action arose from the Kangs' treatment of the two cooperating witnesses.

[3]     The PSR states that:
On June 1, 2003, while the cooperating witnesses were sleeping in a bed at the house, Wun Hee Kang climbed into their bed, grabbed the women, and began kissing them.  When the second cooperating witness pleaded with him to stop, he laughed and stated that he wanted her to touch him sexually.  Wun Hee Kang then fondled the women and left the room.  On

not to press that allegation. As the summer of 2003 continued, the abuse of the cooperating witnesses became more violent. The PSR alleges various instances in which Wun Hee Kang and Hyun Goo Kang, the manager of the Renaissance,[4] slapped or hit the cooperating witnesses, or left them locked in the Kangs' house in Port Jefferson, New York, and unable to leave. In August 2003, Wun Hee Kang took Jane Doe 1 to the basement of his house in Port Jefferson, where he told her that he wanted to kill her and was thinking about selling her. Jane Doe 1 was forced to remain in the Kangs' basement for most of the next two days; eventually, Kyongja Kang told Jane Doe 1 to apologize to Wun Hee Kang, after which Jane Doe 1 was permitted to leave the basement and to resume working at Renaissance.[5] On September 1, 2003, both cooperating witnesses left the house without permission; about three days later, Mr. Kang left a threatening voice mail message for Jane Doe 1 on the mobile telephone he had provided her. The cooperating witnesses then contacted Hyun Goo Kang, who delivered them to Mr. and Mrs. Kang. Mrs. Kang forced both women to kneel in front of her as she screamed obscenities at them; Mr. Kang then came into the room and kicked Jane Doe 1 in the head until she lost consciousness. The next day, the cooperating witnesses overheard Mr. Kang discussing selling them to a brothel in Chinatown, and on the following day,

---

another occasion, Wun Hee Kang forcibly removed the second cooperating witness' underwear and digitally penetrated her. He continued to molest the cooperating witnesses for approximately two weeks, at which time new girls came to live at the house. According to the cooperating witnesses, Wun Hee Kang told the women that it would be futile for them to report his conduct to the police because he had connections in the police department. PSR ¶ 13.

[4] Hyun Goo Kang is not related to Wun Hee or Kyongja Kang. All references to "Mr. Kang" in this opinion refer to Wun Hee Kang, not to Hyun Goo Kang.

[5] The PSR does not indicate the nature of Jane Doe 1's offense that incurred Mr. Kang's ire.

Mr. Kang received a telephone call, which was again overheard by the cooperating witnesses, in which he was advised that the sale of the two women might take another day or two to negotiate.

On September 9, 2003, Jane Doe 2 left the Kangs' house and went to the 109th Precinct of the New York City Police Department, where she was interviewed by a police officer fluent in Korean. She told the officer that Mr. Kang had sexually assaulted her and attempted to force her into prostitution. The police officer then went to the Renaissance, located Jane Doe 1, and interviewed her at the precinct station. Mr. Kang was arrested later that day, charged with unlawful imprisonment and assault, and released. The next day, police interviewed Kyongja Kang, asking about the cooperating witnesses' missing passports. Mrs. Kang replied that she had not confiscated the passports, but merely taken them for safekeeping. The following day, Mr. Kang delivered Jane Doe 2's passport to the police; when asked about Jane Doe 1's passport, Mr. Kang replied that he did not have it and he believed it had been seized by officers during his arrest. The police informed him that Jane Doe 1's passport had not been seized and directed him to find and deliver the passport.

## 2.   Mr. Yushuvayev's Involvement

In fall 2003, petitioner Nisim Yushuvayev was employed as an Inspector for United States Customs and Border Protection, a division of the Department of Homeland Security, and assigned to the Marine Unit at John F. Kennedy International Airport. Prior to obtaining that position in March 2003, Mr. Yushuvayev had been an Inspector for Immigration and Naturalization Services ("INS") from June 2001 through March 2003. Between October and November 2003, Mr. Yushuvayev met with Mr.

Kang and Byungki Koo, a federal air marshal, in the Renaissance on at least two occasions. Knowing that Yushuvayev and Koo were federal agents, Mr. Kang approached them with a scheme to have Jane Doe 1 and 2 forcibly removed from the United States to prevent their testifying against him in the state proceeding. Mr. Yushuvayev initially asked for a price of $5,000 for each "deportation," but ultimately settled with Mr. Kang on a price of $4,000 per person. After the price had been agreed upon, Koo withdrew from the conspiracy, but Mr. Yushuvayev was nevertheless determined to complete the task.

In preparation for the forcible removal of the cooperating witnesses from the United States, Mr. Kang and Mr. Yushuvayev obtained four airline tickets– one each for Jane Doe 1 and 2, Mr. Yushuvayev, and Mr. Kang– from New York to South Korea. On November 22, 2003, Mr. Kang drove Mr. Yushuvayev and Ester Kim, an employee of the Renaissance who was fluent in Korean, to several locations in New Jersey at which they believed Jane Doe 2 might be staying; they were, however, unable to locate Jane Doe 2.[6] Mr. Kang then drove Yushuvayev and Kim to a residence in New York at which they believed Jane Doe 1 to be staying. Mr. Kang then drove away, leaving Yushuvayev and Kim to enter the residence in search of Jane Doe 1. Upon discovering Jane Doe 1 at that residence, Mr. Yushuvayev stated, using Ms. Kim as a translator, that he was an agent of the INS and was there to remove Jane Doe 1 from the United States because she was working in violation of her visa.[7] He then displayed his badge and Jane Doe 1's

---

[6] Ms. Kim was not charged with wrongdoing in connection with her participation in the effort to forcibly deport the cooperating witnesses.

[7] Jane Doe 1's visa had not expired as of that date, thus she was not in the United States illegally, but was illegally working at Renaissance in violation of the conditions of her visa at least until the

passport– the same one which had been taken from her by the Kangs upon her arrival in the United States and which Mr. Kang had denied possessing. In actuality, Mr. Yushuvayev was not on duty that day, was not authorized to contact Jane Doe 1 or initiate deportation proceedings against her, and the government in fact had no open case involving her as of that date. Jane Doe 1 became suspicious and called an acquaintance who is an attorney, who told Jane Doe 1 that if Mr. Yushuvayev was an agent of Homeland Security, she should follow his instructions. The attorney then asked to speak to Mr. Yushuvayev, and asked him what papers he had prepared, to which Mr. Yushuvayev responded that he did not need any papers. The attorney also asked if Mr. Yushuvayev was taking Jane Doe 1 to an INS facility, to which Mr. Yushuvayev replied that he was taking her directly to the airport. Mr. Yushuvayev then terminated the telephone call. Jane Doe 1 then exited the residence with Mr. Yushuvayev and Ms. Kim, and the three of them entered a livery cab, which Mr. Yushuvayev directed to go to JFK Airport. In the car, Jane Doe 1 again called the attorney and explained the situation. The attorney informed her that INS does not use cabs to transport individuals, and that she should demand to be taken to court. Jane Doe 1 then exited the cab, which had driven less than half a block. The petitioner attempted to prevent Jane Doe 1 from exiting the car by telling her repeatedly that she would have a "red line" through her passport which would prevent her from ever re-entering the United States.

Several days later, Jane Doe 1 met with her attorney acquaintance to discuss the incident, and the attorney helped her prepare a statement to take to the police. On December 3, 2003, she reported the incident with Yushuvayev to the police. Later the

day of Mr. Kang's arrest.

same day, Mr. Kang was arrested again and charged with witness tampering; in a statement to police, Mr. Kang admitted that he had sent a man whom he believed to be an INS agent to induce Jane Doe 1 to leave the country for the purpose of preventing her from testifying against him. Jane Doe 1 later identified Mr. Yushuvayev in a photo array as the man who had attempted to force her to leave the country. Mr. Yushuvayev was arrested by federal authorities at his home on January 30, 2004, and initially charged with obstruction of a peonage investigation in violation of 18 U.S.C. § 1581(b). A search of his home uncovered Jane Doe 1's passport. In a series of post-arrest statements, Mr. Yushuvayev admitted his involvement in the scheme to remove Jane Doe 1 from the United States, describing to officers how he met with Koo and Kang, negotiated the price to be paid for his involvement in the conspiracy, and purchased the ticket to South Korea. Mr. Yushuvayev also told agents that when Mr. Koo withdrew from the conspiracy, Yushuvayev attempted to persuade another individual to assist him, but that individual declined the invitation.

### 3. Proceedings in the Underlying Criminal Action

Mr. Yushuvayev was ultimately charged in a superseding indictment with five counts: conspiracy to kidnap in violation of 18 U.S.C. § 1201(c); conspiracy to deprive or intimidate an individual in the exercise of her rights under the Constitution and laws of the United States in violation of 18 U.S.C. § 241; deprivation of rights under color of law in violation of 18 U.S.C. §§ 242 and 2; and two counts of obstructing enforcement of the peonage statute in violation of 18 U.S.C. §§ 1581(b) and 2.[8] The last two counts were

---

[8] Mr. Yushuvayev incorrectly asserts that Mr. Zone advised him to "waive indictment." Petition to Vacate Conviction Pursuant to 28 U.S.C. 2255 ("Pet.") at 4. In actuality, Mr. Yushuvayev was charged in an indictment.

based on allegedly false statements and material omissions made by Mr. Yushuvayev in post-arrest interviews with the government. According to Mr. Zone's declaration submitted in opposition to Mr. Yushuvayev's pending Section 2255 petition, the government initially considered offering Mr. Yushuvayev a cooperation agreement, but declined to do so and added the obstruction charges against him after he repeatedly lied to government agents about his role in the conspiracy. See Declaration of Barry S. Zone, dated May 23, 2007 ("Zone Dec."), ¶ 13; Government's Response in Opposition to Petition to Vacate Conviction Pursuant to 28 U.S.C. § 2255 ("Gov. Mem."), at 9-10.

Mr. Yushuvayev initially entered a plea of not guilty to the charges; however, on November 18, 2005, pursuant to a plea agreement into which he had entered with the government, Mr. Yushuvayev entered a plea of guilty before this Court to Count 17 of the sixth superseding indictment, which alleged as follows:

> In or about and between November 2003 and June 2004, within the Eastern District of New York, the defendants WEE HUN KANG, NISIM YUSHUVAYEV, also known as "Nick," and HYUN GOO KANG, together with others, did knowingly and intentionally conspire to oppress, threaten and intimidate Jane Doe #1 and Jane Doe #2 in the free exercise and enjoyment of rights and privileges secured to them by the Constitution and laws of the United States, to wit: due process and freedom from unreasonable seizure, which offense included kidnapping and an attempt to kidnap.

Superseding Ind. (S-6) ¶ 9. At the plea hearing, after administering an oath to Mr. Yushuvayev and ensuring that he was mentally competent to participate in the proceedings, the Court advised him of the nature of the offense to which he indicated a desire to plead guilty, reading the portion of the superseding indictment quoted above to him. See Transcript of Plea, dated November 18, 2005 ("Plea Tr."), at 3-4. The Court inquired of Mr. Yushuvayev whether he had discussed the charge to which he intended

to plead guilty with his attorney; after Mr. Yushuvayev confirmed that he had, the Court advised him of the rights that he would waive by entering such a plea, including the right to face his accusers at trial, the right against self-incrimination, and the presumption of innocence.  Id. at 4-6.  Of particular importance to the pending petition, the Court specifically advised Mr. Yushuvayev that by pleading guilty, "[y]ou will not have had the opportunity to see who witnesses against you will be, your accusers would be." Id. at 6. Mr. Yushuvayev confirmed that he understood that his guilty plea would waive those rights, and further acknowledged his understanding that the charge to which he intended to enter a guilty plea carried a maximum sentence of imprisonment for life, and that the advisory guidelines range for his offense was estimated to be 121-151 months. Id. at 6-7.  Mr. Yushuvayev also acknowledged his understanding that pursuant to his plea agreement with the government, he voluntarily waived his right to appeal his conviction or sentence if his sentence was not in excess of 168 months.[9] Id. at 9-10.

When asked by the Court to describe the circumstances of his offense, Mr. Yushuvayev responded as follows:

> Between November 2003 and June of 2004, I was an immigration inspector with the Homeland Security.  During that time period I was asked by Mr. Kang— I agreed and did attempt to convince two women to voluntarily leave the United States.  Only as to one, however, I advised her that I worked with the Homeland Security, I displayed my badge and told her that she needed to leave or we would institute formal proceedings to deport her since her visa was expired.

---

[9]  Mr. Yushuvayev's plea agreement, which is attached as an exhibit to the government's memorandum of law in opposition to the pending Section 2255 petition, states in relevant part that "[t]he defendant agrees not to file an appeal or otherwise challenge the conviction or sentence in the event that the court imposes a term of imprisonment of 168 months or below," and that he "waives any right to additional disclosure from the government in connection with the guilty plea." Gov. Mem. Ex. 3 ¶ 4.

> She agreed and at my request she entered the car with me and before we drove away, the woman, she— the woman said she changed her mind and got out of the car and left.

Plea Tr. at 11. The Court then asked AUSA Colleen Kavanaugh to elaborate on the facts

underlying Mr. Yushuvayev's crime:

> THE COURT: Ms. Kavanaugh, what would the government prove if Mr. Yushuvayev went to trial?
> MS. KAVANAUGH: Judge, the government would be prepared to prove that that defendant Mr. Yushuvayev, entered into a conspiracy, that is an agreement with Mr. Kang, and that agreement included that this defendant would intimidate both Jane Doe 1 and Jane Doe 2 into leaving the country by using his INS credentials and telling them that they needed to be deported otherwise he was going to have them arrested. He did that knowing it to be false.
> THE COURT: What else? Where is the kidnapping, attempted kidnapping?
> MS. KAVANAUGH: Judge, the kidnapping is that in furtherance of this conspiracy, Mr. Kang bought several airplane tickets from New York to Korea and one of those tickets was in this defendant's name. And in fact this defendant did go to the travel agency to make sure that his name was spelled properly on that airplane ticket.
> So the conspiracy included an agreement and in fact acts for this defendant to take these women out of the country by trickery which would satisfy the kidnapping elements.

Id. at 12. Mr. Yushuvayev expressly acknowledged the veracity of the government's

account:

> THE COURT: Did you hear everything Ms. Kavanaugh said, Mr. Yushuvayev?
> THE DEFENDANT: Yes, I have.
> THE COURT: Is everything she said true?
> THE DEFENDANT: Very much, yes.

Id. The Court then carefully explained to Mr. Yushuvayev the nature of a criminal

conspiracy and of the offense he was accused of conspiring to commit, and Mr.

Yushuvayev again acknowledged his guilt:

> THE COURT: You are charged with conspiracy to oppress, threaten and intimidate two women. A conspiracy, Mr. Yushuvayev, consists of two

elements. The first element is an agreement. A conspiracy is essentially defined as an agreement to commit a crime. In this case it would be an agreement to oppress, threaten, intimidate two women with respect to their right to enjoy privileges secured to them by the Constitution of the United States, freedom to be free from being unreasonably seized, freedom to be free from unreasonably being seized or held against their will or threatened to be held against their will.

The second element the government would have had to prove if you went to trial is that you were a party to that agreement, that you agreed with Mr. Wun Hee Kang or Hyan [sic] Goo Kang to commit the crime which you are charged with.

So the question is, Mr. Yushuvayev, did you have such and agreement with the 2 codefendants who are named in that charge?

THE DEFENDANT: Yes.

THE COURT: By agreement, I mean an understanding, a meeting of the minds?

THE DEFENDANT: Yes.

THE COURT: And you were knowingly and voluntarily a party to that agreement?

THE DEFENDANT: Yes.

THE COURT: And that took place, I take it, in Queens essentially?

THE DEFENDANT: Yes.

THE COURT: Between November of 2003 and June of 2004?

THE DEFENDANT: Yes.

Id. at 14. Finding that Mr. Yushuvayev had been fully advised of his rights and had knowingly and voluntarily pleaded guilty to Count 17 of the sixth superseding indictment, the Court accepted his plea.

Mr. Yushuvayev's sentencing was initially scheduled for January 26, 2006, but was rescheduled for November 15, 2006. On October 16, 2006, Mr. Zone submitted a sentencing memorandum to the Court urging leniency toward Mr. Yushuvayev; included as an attachment to Mr. Zone's memorandum was a letter to the Court from Mr. Yushuvayev in which the defendant asserted, inter alia, that "[n]ever before have I committed a crime and I will never again do the same." Def. Sentencing Mem., Ex. 6 at 1. In reliance on that statement, Mr. Zone argued in his memorandum that "Mr.

12

Yushuvayev's involvement in the instant offense was clearly out of character.  Indeed, throughout his life, Mr. Yushvayev has placed great emphasis on religion, has worked hard to achieve his goals, and never cut corners.  Never before had Mr. Yushuvayev committed a crime."  Def. Sentencing Mem. at 9; <u>see also</u> <u>id.</u> at 2 ("[B]ut for this case Mr. Yushuvayev has otherwise lived a law-abiding life."); <u>id.</u> at 13 ("Mr. Yushuvayev has never committed a crime and has otherwise lived a law-abiding life.").  In its own sentencing memorandum, the government disputed this claim, asserting that its investigation of Mr. Yushuvayev's personal history had uncovered substantial criminal activity for which he was never charged.  Specifically, the government alleged that:  1) while working as an Immigration Inspector in 2002 or 2003, Mr. Yushuvayev committed fraud and misuse of visas in violation of 18 U.S.C. § 1546 by selling fraudulent visas and immigration stamps, which he obtained from a corrupt United States Immigration and Customs Enforcement official,  to aliens already in the United States, thereby permitting these aliens to extend their stay in the country; 2) on numerous occasions Mr. Yushuvayev patronized brothels in violation of New York Penal Law § 230.03; 3) that Mr. Yushuvayev acted as a promoter of prostitution in violation of New York Penal Law § 230.20 on at least one occasion in which he facilitated access to a prostitute near Coney Island for three South Korean visitors, and then demanded $100 from each of them; and 4) when the men refused to pay, Mr. Yushuvayev threatened to kill them and put his hand on the service revolver he wore on his belt, in violation of New York Penal Law § 265.08 (criminal use of a firearm in the second degree).  On the basis of Mr. Yushuvayev's false statements that he had never committed another crime, the government's sentencing memorandum requested a two-point enhancement to Mr.

Yushuvayev's offense level for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. Mr. Yushuvayev declined the Court's offer of a hearing pursuant to <u>United States v. Fatico</u>, 579 F.2d 707 (2d Cir.1978), to resolve the disputed questions of fact regarding his prior uncharged criminal activity, and at his sentencing hearing, Mr. Zone asked to withdraw from his sentencing memorandum any statements that Mr. Yushuvayev had not committed any prior crimes, urging the Court instead to read those statements as asserting only that the defendant had never been <u>convicted</u> of a crime prior to his guilty plea in this case.[10] <u>See</u> Transcript of Sentencing, dated November 15, 2006 ("Sentencing Tr."), at 4-5. While essentially conceding the inaccuracy of the statements in the sentencing memorandum and in Mr. Yushuvayev's letter to the Court to the effect that Mr. Yushuvayev had never committed a crime prior to his involvement in this offense, Mr. Zone nevertheless urged the Court to deny the government's request for a sentencing enhancement, arguing that the misstatement should be viewed as an innocent mistake by a layperson rather than a calculated attempt to mislead the Court.[11] The Court ultimately concluded that Mr. Yushuvayev's false statements were "a clear affront to 3C1.1," but that they were not sufficiently material to warrant an offense level enhancement under that section. Sentencing Tr. at 6.

---

[10] Though he does not assert this point as a basis for granting relief under Section 2255, Mr. Yushuvayev's memorandum of law criticizes Mr. Zone's failure to object to the "prejudice" created by the government's prior crimes at sentencing. Pet. at

[11] In his declaration in opposition to the pending Section 2255 petition, Mr. Zone is somewhat less forgiving. Mr. Zone asserts in that document that Mr. Yushuvayev "did lie to both the Court and myself about that he had no prior criminal history," Zone Dec. ¶ 24; "failed to inform me of his previous criminal history," <u>id.</u> ¶ 25; and that "[i]f defendant had in fact forewarned me that he had partaken in these activities, I would not have permitted him to submit a letter stating that he had never before committed a crime." <u>Id.</u> ¶ 29. Mr. Zone also concedes that the government proved "that Mr. Yushuvayev continued to lie, even up until his sentencing." <u>Id.</u>

14

Aside from the question of whether to enhance Mr. Yushuvayev's sentence pursuant to U.S.S.G. § 3C1.1, the parties sharply disputed the degree of punishment appropriate for Mr. Yushuvayev's offense at the sentencing hearing. Mr. Zone acknowledged that Mr. Yushuvayev's offense was "very serious," but emphasized that Mr. Yushuvayev became involved in the conspiracy only toward the end of the Kangs' peonage operation and that he was not aware until after his arrest that Jane Does 1 and 2 were victims of human trafficking and peonage. Sentencing Tr. at 8. Mr. Zone also argued that Mr. Yushuvayev had changed his ways and would not commit further crimes, and pointed out that his wife and two children– both born after his arrest in this case– relied exclusively on him for support. In light of these considerations, Mr. Zone urged the Court to impose a sentence lower than the 120 months' incarceration to which it had sentenced Mr. and Mrs. Kang.[12] In contrast, the government, represented at sentencing by AUSA Lee Freedman, argued that the Court should impose a sentence of 168 months, the highest term contemplated by the waiver of appeal provision of the plea agreement. Mr. Freedman argued that the breach of public trust manifested in Mr. Yushuvayev's use of his credentials as an officer of the United States in furtherance of the crime, as well as in his prior uncharged crimes involving the sale of false immigration documents, warranted a sentence more severe than that imposed by the Court on the Kangs; he further argued that, due to the difficulty in investigating and

---

[12] In his declaration in opposition to the Section 2255 petition, Mr. Zone asserts that he urged the Court to sentence Mr. Yushuvayev to a period of three years' incarceration. Zone Dec. ¶ 23. It is true that Mr. Zone's sentencing memorandum requested a three-year sentence. However, after retreating from that memorandum at the sentencing hearing, Mr. Zone did not reiterate his request for the same degree of leniency; he simply argued that "a sentence. . . of less than the Kangs, given [Mr. Yushuvayev's] role in the offense but recognizing the seriousness of his criminal activity, would be appropriate." Sentencing Tr. at 12.

prosecuting cases of public corruption and abuse, the goal of general deterrence would be served by imposing the harshest sentence contemplated by the plea agreement on Mr. Yushuvayev.

Ultimately, the Court calculated Mr. Yushuvayev's offense level to be 33, which indicated an advisory sentence range of 135-168 months.[13] The Court then evaluated Mr. Yushuvayev's offense in light of the factors that it is required to consider pursuant to 18 U.S.C. § 3553(a). As to the first factor, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the Court found that "the nature of the offense is about as serious as an offense could possibly be short of murder, removing two young women, at least that was the objective, from the United States and transporting them to Korea using his office as an immigration officer to accomplish that end." Sentencing Tr. at 16. As to Mr. Yushuvayev's personal characteristics, the Court concluded that "the history and characteristics of the defendant, [are] not very flattering," noting his prior uncharged criminal conduct and the fact that he has a college degree from John Jay College of Criminal Justice, an indication both of intelligence and of the fact that he clearly knew that his conduct was wrong. Id. at 17. Analyzing the factors articulated under Section 3553(a)(2),[14] the Court

---

[13]    Mr. Yushuvayev's adjusted offense level was calculated by beginning from a base offense level of 32 pursuant to U.S.S.G. § 2A4.1, adding six levels pursuant to U.S.S.G. § 2H1.1(b)(1)(A) because Mr. Yushuvayev was a public official at the time of the offense, subtracting three levels pursuant to U.S.S.G. § 2X1.1(b) because the offense was an incomplete attempt or conspiracy, and subtracting two levels pursuant to U.S.S.G. § 3E1.1(a) for acceptance of responsibility.

[14]    18 U.S.C. § 3553(a)(2) instructs the sentencing court to consider:

the need for the sentence imposed--
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;

16

first turned to the seriousness of the offense, and relied on essentially the same points—
Mr. Yushuvayev's college degree in criminal justice, his position as an officer of the
United States, and the heinous nature of his offense— to support its view that Mr.
Yushuvayev's conduct was very serious.  With respect to § 3553(a)(2)'s requirement that
a court consider the need to promote "respect for the law," the Court noted that "[i]t
comes a little late in the day to attempt to instill some respect for the law in somebody
who has so flagrantly violated it.  One would think that having the education that he
had, respect for the law would be just basic.  That's what the John Jay College of
Criminal Justice is all about."  Sentencing Tr. at 18.  Discussing the need to provide just
punishment, to afford adequate deterrence of criminal conduct, and to protect the
public from future crimes of the defendant, the Court found that "it's perfectly clear that
significant punishment is almost compelled in this case" by the application of those
factors.  Sentencing Tr. at 18.  The Court found Mr. Yushuvayev to be a "dangerous"
individual "in the sense that he was flagrantly, flagrantly violating the law and using his
badge to do it," and further noted that "general deterrence is certainly warranted here,"
because Mr. Yushuvayev's punishment would "send a very, very important signal and
message to impress upon others the basic truth that when the law makes certain conduct
criminal, it means it and when the law makes kidnapping and obstruction of justice and
when the law makes it a crime to deprive another person of some fundamental civil
rights, in this case it was liberty, it means it."  Id. at 18-19.  Finally, though concluding

_____

(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care,
or other correctional treatment in the most effective manner. . . .

that Mr. Yushuvayev's actions were "just horrendous," the Court exercised its discretion

to impose a below-guidelines sentence of 120 months. Id. at 19.

### 4. The Pending Section 2255 Petition

On March 30, 2007, Mr. Yushuvayev, now represented by Albert Dayan, filed the

currently pending motion to vacate his conviction and sentence in the underlying

criminal action on the ground that he was ineffectively assisted by Mr. Zone throughout

that proceeding. The central theory of Mr. Yushuvayev's petition appears to be that, far

from being punished as a criminal, he should be commended for taking his position as a

Homeland Security officer so seriously as to single-handedly confront the scourge of

illegal immigration even outside the confines of his official duties by acting unilaterally

to confront the two cooperating witnesses and encourage them to depart from the

United States voluntarily. See, e.g., Pet. at 6-7 ("In this case, the Government arrested

the wrong person. It should have arrested the illegal aliens, that Officer Yushuvayev was

trying to persuade to leave the country.").[15] While criticizing many aspects of Mr. Zone's

representation and accusing him, more than once, of intentionally betraying Mr.

Yushuvayev's trust,[16] Mr. Yushuvayev's petition asserts two specific instances of alleged

ineffective assistance which he argues require a reversal of his conviction and sentence:

first, he argues that Mr. Zone ineffectively advised Mr. Yushuvayev to accept a plea

---

[15]    Mr. Yushuvayev's petition is conspicuously silent regarding the fact that he demanded $8,000 from Mr. Kang for this act of supererogatory patriotism.

[16]    See Pet. at 6 ("Mr. Zone's indifference no [sic] not only violated the Sixth Amendment, but gives appearances that he might have been intentionally betraying his client. . . .  [Mr. Zone's behavior] constituted more than incompetency.  It appears to be disloyalty."); 7 ("Mr. Zone betrayed his own client. . . .  [Mr. Zone] appeared to be more concerned with pleasing the Government than advocating on behalf of his client."); 10 ("A reading of the record in the case at bar reflects a refusal of Mr. Zone to engage in any adversarial role with the Government, and a failure to advocate on behalf of his client. . . .").

agreement which required him to stipulate that the offense involved a kidnapping and conspiracy to kidnap, thus substantially enhancing his base offense level, when the facts underlying Mr. Yushuvayev's offense do not establish a kidnapping; second, Mr. Yushuvayev argues that Mr. Zone acted ineffectively in failing to move to dismiss the charges because the government's failure to identify the cooperating witnesses and the specific nature of the constitutional rights with which Mr. Yushuvayev was alleged to have interfered both violated Mr. Yushuvayev's rights under the Sixth Amendment. In response, the government argues that the waiver of the right to appeal or otherwise challenge his conviction or sentence contained in Mr. Yushuvayev's plea agreement precludes his right to pursue this petition, and that, even if Mr. Yushuvayev is not barred from pursuing this action, Mr. Zone's assistance in the underlying criminal action was not constitutionally ineffective.

On May 23, 2007, Mr. Zone submitted a declaration to the Court in which he disputes all of Mr. Yushuvayev's assertions and conclusions. Mr. Zone reminds the Court that the government's case against Mr. Yushuvayev was "strong," Zone Dec. ¶ 11, in part because "the defendant admitted to the crimes he was being charged with" in post-arrest statements, id., and explains that he spent "countless hours and days," id. ¶ 13, attempting to negotiate a cooperation agreement with the government, but those efforts were undermined because "the defendant continued to lie both about his and other's [sic] role in this criminal scheme." Id. Mr. Zone further contends that he then negotiated a plea agreement which would permit Mr. Yushuvayev to plead guilty to Count 17 in exchange for the dismissal of the other charges against him, that he recommended that Mr. Yushuvayev accept that offer "[b]ased on my assessment of the

strength of the United States government's case and the terms of the plea agreement,"
id. ¶ 16, and that Mr. Yushuvayev "informed me that he absolutely wished to plead guilty
rather than go to trial." Id. ¶ 17. Mr. Zone's declaration also points out that the
memorandum of law in support of the pending petition omits

> an explanation of some very essential questions, such as: (1) Under whose
> authority was the defendant acting when he informed the victim that she was
> being deported; (2) Why the defendant showed up at the victim's home in a
> cab displaying his Homeland Security Badge and his credentials; (3) Why was
> the defendant in possession of the victim's passport; and (4) Why the
> defendant was in possession of an airline ticket to South Korea.

Id. ¶ 21. Mr. Zone observes that by ignoring these questions, "defendant's current
counsel would have this court believe that defendant was simply advising the
cooperating witness to leave the county [sic] because she was illegally in the country and
was illegally working in the Renaissance Bar. . . all in the back of a 'taxicab.'" Id. ¶ 22.
Mr. Zone's declaration concludes with his reiteration that "I effectively and vigorously
represented this defendant at every stage of these proceedings and I strongly believe
that taking all the circumstances into consideration, this defendant received the best
sentence possible." Id. ¶ 33.

## DISCUSSION

**1.      Mr. Yushuvayev's Waiver of the Right to Appeal is not Enforceable as
to His Claims of Ineffective Assistance of Counsel**

The government first argues that Mr. Yushuvayev is bound by his plea agreement,
pursuant to which, as noted above, he purported to waive his right to appeal or
"otherwise challenge" his conviction or sentence if his sentence was not greater than 168
months. Waivers of the right to appeal a conviction or sentence are enforceable in the
Second Circuit; however, such waivers are strictly and narrowly construed against the

government, in recognition of its greater bargaining power in negotiating and the fact

that the government usually drafts plea agreements.  <u>United States v. Cunningham</u>, 292

F.3d 115, 117 (2d Cir. 2002); <u>United States v. Ready</u>, 82 F.3d 551, 556 (2d Cir.1996).  In

most cases, a waiver of the right to appeal or otherwise challenge a conviction or

sentence constitutes a waiver of the right to pursue a collateral attack on the conviction

or sentence via a Section 2255 petition as well.  <u>Garcia-Santos v. United States</u>, 273 F.3d

506 (2d Cir. 2001); <u>see also</u> <u>Adesina v. United States</u>, 461 F. Supp. 2d 90, 96 (E.D.N.Y.

2006) (Glasser, J.) (citing <u>Garcia-Santos</u>).[17]  The situation is somewhat more

complicated in cases in which a petitioner alleges that he was ineffectively assisted in

making the decision to accept a plea agreement; on one hand, rigid enforcement of the

waiver rule would make ineffective assistance in advising a criminal defendant to enter

into a plea agreement effectively unreviewable, while disregarding the waiver agreement

entirely in cases of alleged ineffective assistance would open the door to "obvious []

circumvention of a plea agreement," permitting defendants to cast any purported defect

in the underlying criminal proceeding as a matter of ineffective assistance not

encompassed by the waiver provision.  <u>Pipitone</u>, 67 F.3d at 39.

     The Second Circuit has expressed unease at the suggestion that a waiver of the

---

[17]     <u>Garcia-Santos</u> also reaffirmed the Second Circuit's holding in <u>United States v. Pipitone</u>, 67 F.3d 34 (2d Cir. 1995), that the existence of a waiver of the right to appeal in a plea agreement did not constitute "cause" for failure to appeal a sentence for purposes of the rule which holds that a defendant who fails to raise an issue on direct appeal is generally barred from presenting that issue in a collateral attack under Section 2255.  Mr. Yushuvayev did not appeal his conviction or sentence, but the government does not argue that he is barred on that basis from pursuing his claims in this proceeding.  It is unlikely that such an argument could prevail in light of the Supreme Court's decision in <u>Massaro v. United States</u>, 538 U.S. 500, 509 (2003),  that a criminal defendant's "failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under § 2255."  <u>See</u> <u>Schwamborn v. United States</u>, 492 F. Supp. 2d 155, 161-62 (E.D.N.Y. 2007) (Glasser, J.) (discussing <u>Massaro</u>).

right to appeal should be enforceable against a defendant who argues that his execution

of that waiver was itself the product of ineffective assistance of counsel.  See, e.g., United

States v. Hernandez, 242 F.3d 110, 113-14 (2d Cir. 2001) ("We have suggested that a plea

agreement containing a waiver of the right to appeal is not enforceable where the

defendant claims that the plea agreement was entered into without effective assistance

of counsel.") (citing cases).  In arguing that the waiver provision should be construed to

encompass Mr. Yushuvayev's claims of ineffective assistance, the government relies

exclusively on the Second Circuit's decision in United States v. Monzon, 359 F.3d 110

(2d Cir. 2004), in which the court addressed the effect, at the appellate stage, of a waiver

of appeal on a claim of ineffective assistance.  In Monzon, the court qualified its earlier

statement in Hernandez, rejecting the appellant's reading of that case to mean

> that an appeal waiver becomes unenforceable simply because a defendant claims ineffective assistance of counsel. The appeal waiver would be unenforceable if the record of the criminal proceeding revealed that the claim that the waiver was the result of ineffective assistance of counsel was meritorious.  But if the record on appeal shows that that claim lacks merit, the appeal should be dismissed because the waiver should be enforced. Similarly, if the merits of the ineffective-assistance-of-counsel claim cannot be determined on the basis of the record on appeal, it is appropriate to enforce the appeal waiver and dismiss the appeal. If the rule were otherwise, a defendant who secured the benefits of a plea agreement by, inter alia, knowingly and voluntarily waiving the right to appeal could escape the fairly bargained-for appeal waiver by the simple expedient of asserting an ineffective-assistance-of-counsel claim that had no merit.

Monzon, 359 F.3d at 118-19 (citation omitted).  Monzon further observed that "[t]o find

an appeal waiver unenforceable simply because the defendant makes the claim, where

the record (a) indicates that the appeal waiver was knowing and voluntary and (b) does

not show merit in the ineffective-assistance-of-counsel claim, would 'render the plea

bargaining process and the resulting agreement meaningless.'" Id. (quoting United

States v. Salcido-Contreras, 990 F.2d 51, 53 (2d Cir. 1993)).

Read alone, the Second Circuit's treatment of the issue in Monzon might suggest, in light of the general rule that waivers of the right to appeal affect the right to pursue a collateral attack pursuant to Section 2255 to the same extent as the right to file a direct appeal, that district courts adjudicating Section 2255 petitions alleging ineffective assistance of counsel should enforce the waiver and dismiss the petition if no indication of ineffective assistance is apparent in the record of the underlying criminal action. However, the government's submission fails to acknowledge the Second Circuit's subsequent decision in United States v. Oladimeji, 463 F.3d 152 (2d Cir. 2006), which suggests that a waiver of the right to appeal should be given less deference in the context of a Section 2255 proceeding alleging ineffective assistance than was provided for in the context of a direct appeal in Monzon. Oladimeji noted that the language quoted above from Monzon was "dictum. . . because we did review the merits of that defendant's ineffective-assistance-of-counsel claim," but nevertheless found Monzon's articulation of the standard by which such claims should be reviewed to be persuasive, and formally adopted it. Id. at 155. The court therefore held that

> [a]s the record does not permit assessment of the claim of ineffective assistance and its potential effect on the appeal waiver, the defendant's undertaking not to appeal will be provisionally enforced as to any appellate claim that falls under the appeal waiver, unless and until he prevails (by a habeas petition) in proving that his appeal waiver should be voided because he received ineffective assistance of counsel. When and if he proves that contention, any such claim would be considered as a part of the habeas petition.

Id. Thus, Oladimeji clearly contemplates that a defendant alleging ineffective assistance of counsel shall not be barred by a waiver of the right to appeal from bringing a

collateral attack under Section 2255 asserting that his counsel's recommendation that he accept the plea agreement containing the waiver was itself ineffective assistance.[18] Accord Clark v. Duncan, 01-CV-456 (JKS), 2007 WL 778417, at *3 (N.D.N.Y. March 13, 2007) (28 U.S.C. § 2254 case interpreting Oladimeji to say "that while a waiver of the right to appeal precludes raising an ineffective assistance of counsel issue on direct appeal, it may nonetheless be raised in a habeas petition to set aside the plea.").  On the basis of the Second Circuit's discussion in Oladimeji of the effect of waivers of the right to appeal on the right to pursue a collateral attack under Section 2255, the Court deems Mr. Yushuvayev's waiver of that right in his plea agreement unenforceable in the context of this action, and shall therefore turn to an examination of the merits of Mr. Yushuvayev's petition.

2.    **The Record Establishes That Mr. Yushuvayev is not Entitled to the Relief He Seeks**

Section 2255 states that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."  By implication, if the reviewing court finds that the record of the underlying

---

[18]    In United States v. Adams, 448 F.3d 492, 497 (2d Cir. 2006) (quoting United States v. Maher, 108 F.3d 1513, 1528-29 (2d Cir.1997)), the Second Circuit reaffirmed the rule that even where a waiver of the right to appeal is in effect, "'a defendant retains the right to contend that there were errors in the proceedings that led to the acceptance of his plea of guilty,' and he may argue that the district court failed to satisfy the requirement that there is a factual basis for the plea."  Although Mr. Yushuvayev does argue that the Court lacked a factual basis for accepting his plea, he casts his argument as one for ineffective assistance of counsel, and does not argue that he is exempted from the waiver provision on the basis of Adams.  Even if he were to do so, he would likely be deemed to have waived any such argument by failing to pursue it on direct appeal, since the Massaro exception to the general waiver rule applies only to claims of ineffective assistance of counsel.

criminal action does conclusively show that the petitioner is entitled to no relief, it may dismiss the petition on the basis of the parties' submissions and need not hold an evidentiary hearing. For the reasons stated below, this Court concludes that the record of Mr. Yushuvayev's criminal proceeding clearly establishes that his claims for relief under Section 2255 are meritless, and that his petition shall therefore be dismissed without further proceedings.

Under the law as articulated by the United States Supreme Court and the Second Circuit, "in order to prevail on an ineffective-assistance-of-counsel claim, a defendant must show (1) that his attorney's performance fell below an objective standard of reasonableness, and (2) that as a result he suffered prejudice." United States v. Jones, 482 F.3d 60, 60 (2d Cir. 2006) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). When evaluating the objective reasonableness of defense counsel's actions, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . [and] every effort [must] be made to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689. An informed decision to pursue a litigation strategy, even if that strategy turns out badly for the defendant or seems unwise in retrospect, does not constitute ineffective assistance of counsel so long as it is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001). The Court must also bear in mind that Mr. Yushuvayev's own prior statements, made under oath at his plea hearing, carry a "strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1970); see also Schwamborn v. United States, 507 F. Supp. 2d 229, 245 (E.D.N.Y. 2007) (Glasser, J.) (citing cases). With these principles in mind, the

25

Court will turn to the allegations contained in Mr. Yushuvayev's Section 2255 petition.

### a. Mr. Zone's Advice to Accept the Plea Agreement was not Ineffective

Mr. Yushuvayev first argues that Mr. Zone acted ineffectively in advising Mr.

Yushuvayev to accept a plea agreement that required him to stipulate that his offense

involved a kidnapping and attempted kidnapping, and which contemplated a 168-month

maximum sentence based on a base offense level of 32 pursuant to U.S.S.G. § 2A4.1,

which applies to offenses involving kidnapping, abduction, and unlawful restraint,[19]

---

[19]     As the government points out, Mr. Yushuvayev's petition incorrectly states that he pleaded guilty to kidnapping. As discussed above, Mr. Yushuvayev pleaded guilty to conspiracy to violate the constitutional rights of Jane Doe 1 and 2 in violation of 18 U.S.C. § 241, not to kidnapping or conspiracy to kidnap either cooperating witness. However, the section of the United States Sentencing Guidelines applicable to violations of Section 241 states that the base offense level for violations of that section is either "the offense level from the offense guidelines applicable to any underlying offense," U.S.S.G. § 2H1.1(a)(1), or, if no other guideline is applicable pursuant to that subsection, then a base offense level of 12 shall apply where two or more participants were involved in the offense. Id. § 2H1.1(a)(2). The parties and the Probation Department therefore agreed that Mr. Yushuvayev's sentence should be calculated, pursuant to § 2H1.1(a)(1), on the basis of U.S.S.G. § 2A4.1, which applies to offenses involving kidnapping, abduction, or unlawful restraint.

The government takes its argument too far, however, when it suggests that the propriety of calculating Mr. Yushuvayev's sentence on the basis of U.S.S.G. § 2A4.1 is irrelevant because the 120-month sentence imposed by the Court is within the statutory range provided for under Section 241 even without a kidnapping enhancement. See Gov. Mem. at 14 n. 7 ("Although Yushuvayev allocuted that his crime involved an attempt to kidnap, that allocution was unnecessary given that the Court imposed a sentence of 10 years' imprisonment."). Under the Sentencing Reform Act of 1984 ("SRA") as modified by the Supreme Court in United States v. Booker, 543 U.S. 220 (2005), the district court must correctly calculate the defendant's sentencing range on the basis of the applicable Sentencing Guidelines. See United States v. Canova, 485 F.3d 674, 679 (2d Cir. 2007) ("With respect to procedural reasonableness, '[a]n error in determining the applicable Guideline range or the availability of departure authority would be the type of procedural error that could render a sentence unreasonable under Booker.'" (quoting United States v. Selioutsky, 409 F.3d 114, 118 (2d Cir.2005)). The Court's application of the base offense level of 32 provided for kidnapping offenses under U.S.S.G. § 2A4.1, instead of the base offense level of 12 which would likely have applied under U.S.S.G. § 2H1.1 had Section 2A4.1 not applied, is clearly the sort of procedural error which would render Mr. Yushuvayev's sentence procedurally unreasonable if the application of the higher base offense level was in fact incorrect. Moreover, the government's suggestion that the Court could have imposed the same 120-month sentence regardless of whether Mr. Yushuvayev's advisory sentencing range was 135-168 months (under § 2A1.4) or 12-18 months (under § 2H1.1) is difficult to reconcile with the SRA's instruction that the sentencing court "consider" the applicable Sentencing Guidelines range in imposing sentence. See 18 U.S.C. § 3553(a)(4); Booker, 543 U.S. at 264 (district courts are required to "consult" Sentencing Guidelines). In light of the Supreme Court's subsequent clarification that, while appellate courts must evaluate the substantive reasonableness of every sentence in the post-Booker era under a deferential abuse of discretion standard, "a district judge must

rather than the base offense level of 12 which would have applied pursuant to U.S.S.G. § 2H1.1 had the kidnapping provision not applied.[20]  Central to his argument is the contention that Mr. Zone should have recognized that the acts Mr. Yushuvayev performed, and to which he allocuted at the plea hearing, did not constitute the offense of kidnapping, and that Mr. Zone was therefore ineffective in permitting Mr. Yushuvayev to plead guilty to Count 17, which specified that his conspiracy to violate the rights of the cooperating witnesses included "kidnapping and an attempt to kidnap." The government does not respond to the substance of this point, arguing only on the basis of Monzon, Hernandez, and United States v. Dielevic, 242 F.3d 110, 107 (2d Cir. 1998) ("If we were to allow a claim of ineffective assistance of counsel at sentencing as a means of circumventing plain language in a waiver agreement, the waiver of appeal provision would be rendered meaningless."), that Mr. Yushuvayev's waiver of his right to appeal or otherwise challenge his sentence precludes this basis for relief.  It is not entirely clear whether the language quoted from Dielevic survives Oladimeji, at least as to collateral attacks under Section 2255 rather than direct appeal, but in any event, the government's argument misconstrues the basis of Mr. Yushuvayev's claim as an attack only on Mr. Zone's failure to object to the calculation of Mr. Yushuvayev's advisory

---

give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications," it is unlikely that this Court could have justified imposing such a vast upward departure from the 12-18 month advisory range that would otherwise have applied.  Gall v. United States, 128 S. Ct. 586, 594 (2007).

[20]     Mr. Yushuvayev's petition erroneously assumes that, but for the application of U.S.S.G. § 2A4.1, his Sentencing Guidelines range would have been 10-16 months.  Pet. at 7.  This is incorrect; assuming that all of the adjustments that were applied at Mr. Yushuvayev's actual sentencing would have been applied at the hypothetical sentencing at which his base offense level was calculated on the basis of § 2H1.1(a)(2), his adjusted offense level would have been 13, resulting, as discussed in note 19, supra, in an advisory Guidelines range of 12-18 months.

sentence range pursuant to § 2A1.4 at his sentencing hearing, rather than an attack on the sufficiency of Mr. Zone's assistance in advising Mr. Yushuvayev to enter into the plea agreement which required him to stipulate that his offense involved a kidnapping and conspiracy to kidnap. For the reasons stated above in its discussion of the waiver issue, the Court finds that Mr. Yushuvayev's challenge to the sufficiency of Mr. Zone's representation on the basis of Mr. Zone's advice to accept the plea agreement, which resulted in the calculation of Mr. Yushuvayev's sentence on the basis of the kidnapping provision in U.S.S.G. § 2A4.1, is not barred by the waiver provision contained in his plea agreement.

Turning to the merits of Mr. Yushuvayev's argument, it is clear that he is not entitled to the relief he seeks. Mr. Zone was not ineffective in advising Mr. Yushuvayev to accept the plea agreement, or in failing to object to the calculation of Mr. Yushuvayev's sentence on the basis of the offense level provided by U.S.S.G. § 2A4.1, because the application of the kidnapping guideline was clearly warranted by the facts and evidence of the case. Mr. Yushuvayev's argument relies largely on the facts that Jane Doe 1 was permitted to telephone her attorney twice during her encounter with Mr. Yushuvayev, and that Mr. Yushuvayev permitted her to exit the taxi without attempting to physically restrain her. Neither of these facts undermines the government's assertion, to which Mr. Yushuvayev stipulated in the plea agreement and admitted at his plea hearing, that his offense involved kidnapping and a conspiracy to kidnap.[21]

---

[21] Interestingly, the version of the plea agreement attached as Exhibit B to Mr. Yushuvayev's sentencing memorandum in the underlying criminal action has the handwritten word "attempted" placed before "kidnapping," which would result in an acknowledgement that the offense involved "attempted kidnapping and a conspiracy to kidnap," rather than a completed kidnapping offense. However, that copy of the agreement lacks the parties' signatures, while the copy attached to the government's memorandum

The federal kidnapping statute, 18 U.S.C. § 1201(a), provides for criminal liability against

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when--
> (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense. . . .

It is clear from the face of this statute that Mr. Yushuvayev did not commit a completed act of kidnapping– Jane Doe 1 was not transported across state or national lines, nor did Mr. Yushuvayev or any co-conspirator cross any state or national boundary in furtherance of the scheme.  However, the objective of the conspiracy into which Mr. Yushuvayev conceded himself to have knowingly and voluntarily entered was the kidnapping of Jane Doe 1 and 2, and, though his efforts were unsuccessful, he did <u>attempt</u> to attain that objective, at least as to Jane Doe 1, when he entered her home on November 22, 2003, and attempted under false pretenses to compel Jane Doe 1 to accompany him to John F. Kennedy airport, and thence to South Korea, for the purpose of preventing her testimony against Mr. Kang.  That Mr. Yushuvayev did not intend to use physical force to restrain Jane Doe 1 is immaterial; Section 1201(a) makes clear that a kidnap victim need not be "seize[d]" or "confine[d]" in order for criminal liability to attach, but states explicitly that such liability may be imposed when the defendant "inveigles" or "decoys" the victim into accompanying him under false pretenses.  The

---

in opposition to Mr. Yushuvayev's pending Section 2255 petition is marked "Court's Exhibit #1, 11/8/05," and bears the parties' signatures, including those of Mr. Yushuvayev and Mr. Zone.  The Court shall therefore consider the version of the agreement submitted by the government to be the controlling one.

Second Circuit has recognized that for purposes of liability under Section 1201(a), the terms "inveigle" and "decoy" "involve nonphysical takings by which the kidnapper, through deception or some other means, lures the victim into accompanying him." United States v. Macklin, 671 F.2d 60, 66 (2d Cir. 1982). In this case, Mr. Yushuvayev admitted under oath that he attempted to inveigle Jane Doe 1 into accompanying him by presenting his Homeland Security credentials and falsely claiming to be acting under color of law with the authority of the United States government.[22] In Macklin, the court ultimately reversed the defendant's conviction, finding that "even if there was sufficient evidence of inveiglement, there is no evidence whatsoever that either of the children was 'held' or 'transported' against his or her will. Rather, the evidence indicates that both children were free to come and go as they pleased, to speak to other people, and to leave appellant at any time they wished." Id. Mr. Yushuvayev argues that because he did not attempt to physically interfere when Jane Doe 1 left the taxi after speaking with her attorney the second time, he was not guilty of kidnapping. Mr. Yushuvayev is mistaken; the Supreme Court has held that "[t]he act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." Chatwin v. United States, 326 U.S. 455, 460 (1946) (emphasis added). This is precisely what Mr. Yushuvayev attempted: by appearing at Jane Doe 1's residence under false pretenses and informing her that he was acting on behalf of the United

---

[22] The fact that Mr. Yushuvayev permitted Jane Doe 1 to call her attorney while he and Ms. Kim were inside her apartment does not undermine the fact that he attempted to abduct her via false claims of legal authority. Indeed, permitting Jane Doe 1 to contact her attorney initially aided Mr. Yushuvayev's efforts, since the attorney told Jane Doe 1 during the first conversation that she should go with Mr. Yushuvayev.

States government to remove her from the country, he intended to place Jane Doe 1 under an unlawful mental restraint–her own rational fear of the legal authorities– for an appreciable period of time– i.e., the time necessary to travel from Queens to South Korea.  But for Jane Doe 1's seeing through his duplicity and exiting the taxi when it became apparent to her that Mr. Yushuvayev was not acting pursuant to any legal authority to detain her, he would have succeeded in his attempt to hold and transport her to South Korea against her will.  Moreover, Mr. Yushuvayev did attempt to continue his inveiglement when Jane Doe 1 exited the taxi, maintaining the pretense of acting under official authority by shouting after her that her passport would be cancelled and she would never be permitted to return to the United States if she did not accompany him.  The fact that he did not resort to physical force to prevent Jane Doe 1 from exiting the taxi does not undermine his liability for attempting to kidnap Jane Doe 1 by inveiglement in violation of Section 1201(a), just as the fact that a victim escaped from a physical constraint would not exculpate a kidnapper who relied on physical rather than mental restraint to commit his crime.  Finally, Mr. Yushuvayev was guilty of conspiring to kidnap Jane Doe 1 notwithstanding the fact that he ultimately failed to attain the object of that conspiracy.  The conspiracy itself, rather than Mr. Yushuvayev's botched attempt to commit the actual crime, is sufficient to satyisfy the allegation contained in Count 17, to which Mr. Yushuvayev stipulated in his plea agreement and conceded at his plea hearing.[23]  Thus, the calculation of Mr. Yushuvayev's sentence on the basis of

---

[23]  Mr. Yushuvayev also asserts in the preliminary portion of his memorandum of law in support of the pending petition that "there is no claim that he committed any overt act referrable to such conspiracy. . . ."  Pet. at 2.  He does not assert this as a basis for reversing his conviction, and the Court need not dwell on it.  The government argues that no overt act is necessary for a conviction under 18 U.S.C. § 241, and some case law from other circuits supports that view.  See, e.g., United States v.

U.S.S.G. § 2A1.4 was proper, and Mr. Zone's advice that Mr. Yushuvayev stipulate to that point in order to obtain a plea agreement was not ineffective assistance.

      **b.    Mr. Yushuvayev was Apprised of the Nature of the Constitutional Rights He Conspired to Violate**

The Court need not address at length Mr. Yushuvayev's second argument, that Mr. Zone acted ineffectively in failing to object or move for a dismissal because the government violated his Sixth Amendment right to confront his accusers and to be made aware of the nature of the charges against him, because it is patently absurd and is contradicted at numerous points in the record of the underlying criminal action.

Mr. Yushuvayev first suggests that the government's identification of the cooperating witnesses in the superseding indictment by the pseudonyms Jane Doe 1 and Jane Doe 2 violated his right pursuant to the Confrontation Clause of the Sixth Amendment to confront the witnesses against him– going so far as to suggest that he has no idea who these witnesses are, and that they may not exist at all.[24]  Mr. Yushuvayev offers no authority for the incredible proposition that the Sixth Amendment

---

Skillman, 922 F.2d 1370, 1375-76 (9th Cir. 1990);  United States v. Morado, 454 F.2d 167, 169 (5th Cir. 1972); Williams v. United States, 179 F.2d 644, 649 (5th Cir. 1950).  The Court need not resolve that question, however, because even if Section 241 does contain an overt act requirement, Mr. Yushuvayev's actions of obtaining a ticket to South Korea, driving in search of Jane Doe 1 and 2, and attempting to force Jane Doe 1 to accompany him to the airport all easily qualify as overt acts sufficient to sustain a conviction for conspiracy.

[24]    See, e.g., Pet. at 3-4 ("Officer Yushuvayev was arrested and charged with conspiring to violate the unidentified Korean woman's Constitutional rights. . . leaving in mystery, not only her identify [sic], but what overt act Officer Yushuvayev committed in furtherance of any conspiracy and beyond that what specific Constitutional right of this mystery woman was violated."); 4 (Mr. Zone "never even requested the identity of the alleged complainant or any other particulars, leaving in mystery. [sic] whether this complainant even exists, nor a bill of particulars as to what Constitutional right of this woman, Officer Yushuvayev violated.").  Given his own sworn statements acknowledging the events underlying his arrest, as well as the fact that Jane Doe 1's passport was found at his residence, Mr. Yushuvayev's suggestion that Jane Doe 1 may be a mere fabrication of the government does not lend credibility to his present cause.

precludes the government from identifying cooperating witnesses by pseudonyms in indictments, which is a common practice. The Confrontation Clause has historically been understood as "basically a trial right" which "includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness." Barber v. Page, 390 U.S. 719, 725 (1968); accord United States v. Owens, 484 U.S. 554, 559 (1988) ("The Confrontation Clause guarantees only an opportunity for effective cross-examination. . . ." (quoting Kentucky v. Stincer, 482 U.S. 730, 739 (1987)) (emphasis omitted). Although Justice Blackmun expressed his "personal view" in Stincer "that there are cases in which a state rule that precludes a defendant from access to information before trial may hinder that defendant's opportunity for effective cross-examination at trial, and thus that such a rule equally may violate the Confrontation Clause," that view has never been adopted by a majority of the Court, and it would not, in any event, offer any support to Mr. Yushuvayev's contention that the Confrontation Clause requires the government to identify its cooperating witnesses in the indictment. 482 U.S. at 738 n. 9 (emphasis omitted).[25]

Mr. Yushuvayev's contention that Mr. Zone was ineffective in failing to demand a specification from the government as to which constitutional rights of the cooperating witnesses he conspired to violate is equally frivolous. While it is indisputably true that a criminal defendant is entitled to "be informed of the nature and cause of the accusation" against him, the record is replete with instances in which Mr. Yushuvayev was informed

_____

[25] The government also asserts that, during discovery in the underlying criminal case, it provided Mr. Yushuvayev with copies of the airline tickets bearing the names of Jane Doe 1 and 2, and a copy of Jane Doe 1's passport. See Gov. Mem. at 23. While these facts are not necessary to deny this aspect of Mr. Yushuvayev's petition, they further highlight the disingenuousness, if not outright mendacity, which pervades much of the petitioner's memorandum of law in support of his petition.

of the nature of the constitutional rights that he conspired to violate.  U.S. Const. Amend. 6.  For example, Count 17 of the indictment, to which Mr. Yushuvayev pleaded guilty, clearly states that he conspired to oppress the cooperating witnesses "in the free exercise and enjoyment of rights and privileges secured to them by the Constitution and laws of the United States, to wit:  <u>due process and freedom from unreasonable seizure</u>. . . ." (emphasis added).  Moreover, at Mr. Yushuvayev's plea hearing, the Court explained to Mr. Yushuvayev that he was charged with having participated in a conspiracy "to oppress, threaten, intimidate two women with respect to their right to enjoy privileges secured to them by the Constitution of the United States, freedom to be free from being unreasonably seized, freedom to be free from unreasonably being seized or held against their will or threatened to be held against their will."  Plea Tr. at 13.  Mr. Yushuvayev then expressly acknowledged that he understood the nature of the charges and that he wished to plead guilty.  <u>Id.</u> at 13-14.  Mr. Yushuvayev's continued insistence that he was completely unaware of the nature of the constitutional rights that he was charged with conspiring to violate is patently meritless and warrants no further discussion by this Court.

3.     **No Certificate of Appealability Shall Be Issued**

Pursuant to 28 U.S.C. § 2253(c)(1)(B), a final order in a Section 2255 proceeding is not appealable unless the district court issues a certificate of appealability.  Such a certificate should be issued only "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented

were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 & n. 4 (1983)).  For the reasons noted in the Court's discussion of the merits of Mr. Yushuvayev's petition, this case falls far short of satisfying that standard.  Therefore, no certificate of appealability shall be issued.

## **CONCLUSION**

For the reasons stated above, petitioner Nisim Yushuvayev's petition, pursuant to 28 U.S.C. § 2255, to vacate his conviction and sentence in the underlying criminal action, 04-CR-87, is hereby DISMISSED.  No certificate of appealability shall be issued.


SO ORDERED.

Dated:        Brooklyn, New York
                  January 18, 2008

                                                      _____/s/_____

                                                      I. Leo Glasser
                                                      United States Senior District Judge


35

Copies of the foregoing memorandum and order were electronically sent to:

<u>Counsel for the Petitioner</u>

Albert Y. Dayan
Law Office of Mr. Albert Y. Dayan
8002 Kew Gardens Road
Suite 902
Queens, NY 11419

<u>Counsel for the Defendant</u>

Lee Joshua Freedman
United States Attorney's Office
271 Cadman Plaza East
Brooklyn, NY 11201